UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Case No ___1:20CR111JJM-LDA___ |
| v. | In Violation of 18 U.S.C. §§ 1349 (conspiracy) and 1343 (wire fraud) |
| SAHIL NARANG | |

**INFORMATION**

The United States Attorney charges that:

**COUNT 1**
(Conspiracy to Commit Wire Fraud)

**Introduction**

At all times relevant to and for the purposes of this Information:

1.      Defendant Sahil Narang ("NARANG") was a foreign national, who held a visa that permitted him to travel and stay for periods of time in the United States.

2.      "Pop-up advertisements" refers to the form of online advertising that surreptitiously appears or pops-up on computer screens while users are browsing other material on the World Wide Web.  Generally, pop-up advertisements are generated by code embedded in certain web sites.  If a computer user navigates to or from such a web site, the embedded code directs the user's internet browser to open a new browser window and display the pop-up advertisement.

3.      "Malware" refers to software that is designed to disrupt, damage, or gain unauthorized access to a computer system.  Computer viruses are a form of malware.

4.      "Call center" refers to an operation or organization that engages in telephone communications with the public, and includes facilities staffed by operators who attempt to sell purported computer protection services to callers who have been misled to believe that malware has been detected on their computers.

5.      "Tech Fraud" refers to a scheme whereby fraudsters mislead victims to believe that malware has been detected on their computers and thereby induce them to part with funds believing that computer protection services are being purchased.  To

mislead the victims to believe that malware has been detected on their computers, pop-up advertising is used.  To induce the purchase of the purported computer protection services, operators at call centers are used.

6.      "Refund Fraud" refers to a scheme whereby funds are obtained from victims of Tech Fraud.  The victims are told that they are due refunds, including refunds for purported computer protection services previously purchased.  The victims are mislead to believe that amounts in excess of the refund amounts were mistakenly deposited in the victims' bank accounts, even though no deposits were actually made into the victims' bank accounts.  The victims are thereby induced to direct their own money to the fraudsters.  Call center operators are used by fraudsters engaged in Refund Fraud.

### The Conspiracy

7.      Beginning on a date that is not known but that is no later than on or about August 30, 2018 and continuing through May 1,2019, in the District of Rhode Island and elsewhere, Defendant NARANG and coconspirators did knowingly, willfully, and unlawfully combine, conspire, and agree with each other and other unknown persons to commit wire fraud by knowingly devising and intending to devise a scheme and artifice to defraud and obtain money and property from others by means of false and fraudulent pretenses, representations, and promises, through the transmission in interstate commerce of wire communications, in violation of 18 U.S.C. §§ 1343.

### Object of the Conspiracy

8.      The object of the conspiracy was for Defendant NARANG and his coconspirators to enrich themselves unlawfully by obtaining money from others, including (i) through Tech Fraud, by obtaining funds from the victims by offering them putative computer protection services after misleading them to believe that malware had been detected on their computers, and (ii) through Refund Fraud, by obtaining funds from victims by misleading them to believe that they, in the course of being

issued refunds, had accidentally been sent money far in excess of the intended refunds.

**Manner and Means of Conspiracy**

9.    Via interstate wire transmissions, pop-up advertising was directed – by coconspirators and Defendant NARANG – to victims falsely representing that malware had been detected on the victims' computers and directing the victims to calls for assistance.

10.    Telephone call routing technology directed the victims' calls to call center operators who offered to sell the victims putative computer protection services and directed them to make payment for those putative services in a manner that allowed for the funds to be directed to Defendant NARANG and coconspirators.

11.    After the conclusion of the Tech Fraud, call center operators placed telephone calls to Tech Fraud victims, advised them that they were entitled to refunds, including refunds for the putative computer protection services they had purchased. During the interactions, the operators obtained remote access to the victims' computers by suggesting, *inter alia*, that the access was necessary for processing the refunds or conducting a final malware check.

12.    Using the remote access, call center operators displayed false account information on the victims' computer screens, and thereby deceived the victims into believe that funds in excess of the supposed refund amounts had been deposited into the victims' bank accounts, even though all the while, no funds were actually deposited into the victims' bank accounts.

13.    Finally, the call center operators had the victims send their own funds to Defendant and coconspirators by directing the victims to "return" the supposed excess by wiring funds to a specified bank account.

14.    Defendant NARANG obtained images of the victims' wire transfers – which included details such as the victims' names, addresses, bank account numbers, and driver's license numbers – to verify the transfers and identify funds that were sent

to the specified bank account.

## Acts in Furtherance of Conspiracy

15.     Between August 30, 2018 and May 5, 2019, Defendant NARANG routed to call center operators engage in perpetuating Tech Fraud 19,363 calls from victims who had by pop-advertisements on their computers been deceived into believing that malware had been detected on their computers.

16.     On or about February 14, 2019, AB, who at the time was located in Rhode Island and was acting at the direction of law enforcement agents, telephoned Defendant NARANG and advised that a bank account had been obtained (hereinafter "AB's Account"), and Defendant NARANG notified AB that victim funds would be wired to AB's Account and that AB should withdraw those funds within two days of receipt so as to prevent victims from recovering the funds.  Defendant NARANG also promised to relay in the future details as to how AB would get his "cut" and how money would be directed to Defendant NARANG in India.

17.     On or about February 17, 2019, Defendant NARANG advised AB that $10,000 was being wire to AB's Account, and Defendant NARANG sent an image of a wire transfer form that listed SM's name, address, and driver's license number as well as bank account number and bank name.  Subsequently, $10,000 was received in AB's Account from SM's account.

18.     On or about February 27, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $4,500 was being wired to AB's Account; the form specified CJ's name, address, and driver's license number as well as bank account number and bank name.  Subsequently, $4,500 was received in AB's Account from CJ's account.

19.     On or about February 28, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $15,000 was being wired to AB's Account; the form specified RP's name, address, and phone number as well as bank account number

and bank name.  Subsequently, $15,000 was received in AB's Account from RP's account.

20.    On or about February 28, 2019, Defendant NARANG, via text message to AB, inquired whether the money had been received and specified that an additional $15,000 was waiting to be sent.

21.    In February 2019, RP was deceived by a caller into believing that $30,000 had mistakenly been transferred into her account and that she needed to return the money, even though that money had not been deposited into the account.  Having been deceived, RP authorized the transfer of $30,000 of her own money.

22.    On or about March 4, 2019, Defendant NARANG sent AB a screen shot displaying WM's bank account information, including bank name, WM's name, and the last four digits of WM's checking account number, saving account number, and equity line of credit account number.  The screen shot displayed the account balances at the time:  more than $100,000 in the checking and savings accounts and a balance of $450,000 available in the equity line of credit account.

23.    On or about March 4, 2019, Defendant NARANG sent AB text messages specifying that there was a "client" with $80,000 and specifying that the person was willing to pay because he had been "scammed[.]"

24.    On or about March 6, 2019, a male telephoned WM, requested and received remote access to WM's computer, and advised WM that his computer had been compromised.  Prior to March 6, 2019, WM had paid callers for computer technical support, after being told by callers that his Microsoft software had been compromised and would be "shutoff."

25.    On or about March 7, 2019, Defendant NARANG sent AB an image of a KC's driver's license, which included his name, address, date of birth and driver's license number and texted AB that $5,000 was going to be taken from KC.  Defendant NARANG then sent AB an image of a wire transfer form that revealed a portion of KC's

bank account number and the full name of KC's bank.  That same form specified that $5,000 was being sent to AB's Account.

26.    On or about March 7, 2019, KC was deceived by a caller into believing that $5,000 had mistakenly been transferred into KC's account and that he needed to return the money.  KC was shown an image on his computer screen that appeared to indicate $5,000 had been deposited into his account, but no such money had actually deposited into his account.  Having been deceived, KC subsequently wired $5,000 of his own money to AB's Account.

27.    On or about March 11, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $3,500 was being wired to AB's Account. Subsequently, $3,500 was wired to AB's Account from LB's bank account.

28.    In March 2019, LB was deceived by a caller into believing that $4,000 had mistakenly been transferred into her account and that she needed to return the money. LB was shown an image on her computer screen that appeared to indicated that $4,000 had been deposited into her account, but no such money was actually deposited into her account.  Having been deceived, LB wired $3,500 of her own money to AB's Account.

29.    On March 14, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $24,500 was being sent from VL's bank account to AB's Account.  The form listed VL's name, driver's license number, bank account number, and bank name.

30.    In or around March 2019, VL was told that she was owed a refund and then deceived by a caller into believing that $24,500 had mistakenly been transferred into her account and that she needed to return the money.  The caller obtained remote access to VL's computer.

31.    On or about April 5, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $5,000 was being sent from MS's bank account to

AB's Account.  The form listed MS's name, address, social security number, and home telephone number as well as MS's bank account and bank name.  Subsequently, AB's Account received via wire $5,000 from MS's bank account.

32.   In or around April 2019, MS was offered a $100 refund by a caller and was then deceived into believing that $10,000 had mistakenly been deposited into her account.  Having been deceived, she wired $5,000 of her own money to AB's Account and mailed $5,000 of her own money, in cash, to a location in California.

33.   On or about April 12, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $28,500 was being sent from RS's bank account to AB's Account.  The form listed RS's name, address, and bank account number and bank name.  Subsequently, AB's Account received via wire $28,500 from RS's bank account.

34.   On or about April 15, 2019, Defendant NARANG sent AB an image of a wire transfer form that indicated that $9,900 was being sent from ED's bank account to AB's Account.  The form listed ED's name, address, bank account number, and bank name.  Correspondingly, in mid-April 2019, AB's Account received via wire $9,900 from ED's bank account.

35.   In or around April 2019, ED was deceived into believing that in the process of being issued a refund $9,900 had mistakenly been deposited into his bank account.  Having been deceived, he wired $9,900 of his own money to AB's Account.

All in violation of 18 U.S.C. § 1349.

## COUNTS 2-11
(Wire Fraud)

36.     The allegations contained in paragraphs 1-6 are re-alleged and incorporated by reference as though fully set forth herein.

### Scheme and Artifice to Defraud

37.     Beginning on an unknown date that is no later than on or about August 31, 2019 and continuing through May 1, 2019, Defendant NARANG knowingly and with intent to defraud did devise a scheme to defraud and obtain money from others by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, through the transmission of interstate commerce of wire communications.

### Object of Scheme to Defraud

38.     The object of the scheme to defraud was the same as the object of the conspiracy to commit wire fraud, and accordingly, paragraph 8 is re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Scheme to Defraud

39.     The manner and means of the scheme to defraud were the same as the manner and means of the conspiracy to commit wire fraud, and accordingly, paragraphs 9 through 14 are re-alleged and incorporated by reference as though fully set forth herein.

### Execution of the Scheme to Defraud

40.     On or about the date set forth below, in the District of Rhode Island and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud, Defendant NARANG did transmit and cause to be transmitted from India to the United States certain wire communications in interstate and foreign commerce, each wire communication constituting a separate count, as more particularly described in the following table:

| COUNT | DATE OF WIRE TRANSMISSION | ACTUAL OR INTENDED AMOUNT | VICTIM IDENTIFIER |
|---|---|---|---|
| 2 | Feb. 17, 2019 | $ 10,000 | SM |
| 3 | Feb. 27, 2019 | $ 4,500 | CJ |
| 4 | Feb. 28, 2019 | $ 30,000 | RP |
| 5 | Mar. 4, 2019 | $ 450,000 | WM |
| 6 | Mar. 7, 2019 | $ 5,000 | KC |
| 7 | Mar. 11, 2019 | $ 3,500 | LB |
| 8 | Mar. 14, 2019 | $ 24,500 | VL |
| 9 | Apr. 5, 2019 | $ 5,000 | MS |
| 10 | Apr. 12, 2019 | $ 28,500 | RS |
| 11 | Apr. 15, 2019 | $ 9,900 | ED |

All in violation of 18 U.S.C. §§ 1343 and 1349.


AARON L. WEISMAN
United States Attorney


MILIND M. SHAH
Assistant U.S. Attorney


SANDRA HEBERT                                    Date:  December 2, 2020
Assistant U.S. Attorney
Deputy Criminal Division Chief